IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MICHAEL B. RUSSO, M.D.,          )      CIVIL NO. 10-00125 LEK
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
STEPHEN B. JONES, in his         )
capacity of the Commander of     )
Tripler Army Medical Center;     )
JOHN OR JANE DOES 1-25; and      )
DOE ENTITIES 1-25,               )
                                 )
          Defendant.             )
_____  )

### ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Before the Court is Plaintiff Michael B. Russo, M.D.'s ("Plaintiff") Motion for Temporary Restraining Order ("Motion"), filed on April 5, 2010.  Defendant Stephen L. Jones, in his official capacity as Commander of Tripler Army Medical Center ("Defendant") filed his memorandum in opposition on April 9, 2010, and Plaintiff filed his reply on April 12, 2010.  This matter came on for hearing on April 16, 2010.  Appearing on behalf of Plaintiff, who was present, were Eric Seitz, Esq., and Ronald Kim, Esq., and appearing on behalf of Defendant were Major Jennifer Bottoms, and Derrick Watson, Assistant United States Attorney.  After careful consideration of the Motion, supporting and opposing memoranda, and the arguments of counsel, Plaintiff's Motion is HEREBY DENIED for the reasons set forth below.

## BACKGROUND

On March 8, 2010, Plaintiff filed his Verified Complaint for Declaratory and Injunctive Relief ("Complaint") in the instant case.  Plaintiff is a physician specializing in neurology and sleep disorders.  He began working at Tripler Army Medical Center ("TAMC") in 2007.  [Complaint at ¶¶ 7, 9.]  The Complaint alleges that Plaintiff made "a number of suggestions to improve the management, administration, efficiency, and overall quality of the neurology clinic . . . ."  [Id. at ¶ 9.]  Most of Plaintiff's suggestions were not acted upon, prompting Plaintiff to make repeated requests for a transfer out of the neurology clinic because of his concerns about the quality of care and because some of his colleagues "subjected him to bullying and reprisals" because of his suggestions.  [Id. at ¶ 10.]  He also alleges that "his superiors, peers, subordinates, staff, and others in the neurology clinic . . . retaliated against Plaintiff and made efforts to prevent him from continuing to practice in the neurology clinic at TAMC."  [Id. at ¶ 12.]

Plaintiff states that, on or about January 8, 2009, Commander Judith Dickert, the Chief of Medicine for TAMC, verbally informed Plaintiff that his clinical privileges were being summarily suspended and that she had referred the matter to the TAMC Credentials Committee ("Credentials Committee").  Plaintiff alleges that the suspension was based on anonymous,

unfounded accusations of incompetence.  Plaintiff alleges that the summary suspension was improper because Army Regulations only provide for summary suspension in response to critical incidents of obvious misconduct, incompetence, or negligence which pose a clear threat to patient safety or the well-being of others. Plaintiff alleges that there was no critical incident which would warrant his summary suspension, and the Army has not informed him of what alleged critical incident purportedly necessitated his summary suspension.  [Id. at ¶¶ 13-15.]

In a January 16, 2009 letter, Captain David A. Lane, Deputy Commander of Clinical Services for TAMC, informed Plaintiff that his clinical privileges were indefinitely suspended during due process proceedings based on the allegations of Plaintiff's incompetence.  The letter stated that there would be a clinical quality management quality assurance ("CQMQA") investigation and, if the investigation established substantial cause to proceed, the Credentials Committee would conduct a peer review.  [Id. at ¶¶ 22-23.]

On or about January 27, 2009, Captain Lane informed Plaintiff that his summary suspension had been rescinded, but that Plaintiff's credentials would be held in abeyance pending preliminary review of the allegations.  [Id. at ¶ 25.]  Plaintiff alleges that there was never any valid basis to hold his credentials in abeyance.  [Id. at ¶ 27.]

According to the Complaint, Colonel Thomas B. Francis, M.D., who had been assigned to the CQMQA investigation, wrote in a February 26, 2009 memorandum to the Credentials Committee that there was no evidence supporting the allegations of incompetence. The Credentials Committee, however, went forward with the peer review. In a May 4, 2009 memorandum, the peer review panel found that the case against Plaintiff was relatively weak, and it recommended that Plaintiff be fully reinstated after an additional training, monitoring, and evaluation period of thirty to sixty days. [Id. at ¶¶ 28-30.] In a June 5, 2009 letter, Defendant conditionally reinstated Plaintiff's privileges, pending a sixty-day training, monitoring, and evaluation period. The letter did not discuss any right to a formal hearing. [Id. at ¶¶ 31, 33.] In a October 8, 2009 memorandum, Captain Lane stated that Plaintiff had completed the training and that he could practice clinically under further supervision. The supervision was to be completed by October 30, 2009, but Plaintiff states that Defendant has indefinitely continued the restrictions on Plaintiff's clinical privileges. Plaintiff alleges that Defendant never gave him proper notice or a hearing to contest the suspension and/or restriction of his privileges. Plaintiff believes that Defendant will report the suspension and/or abeyance of his clinical privileges to the National Practitioners Data Bank ("NPDB"). [Id. at ¶¶ 35-38.] Plaintiff

4

asserts that, if there is any report to the NPDB, he "will suffer serious, lasting, and irreparable harm to his professional reputation and standing that cannot and will not subsequently be remedied if and when Plaintiff later prevails and has his hospital privileges, [sic] restored unconditionally." [Id. at ¶ 39.]  He alleges that, other than the instant action, there are no remedies available to him to prevent Defendant from continuing to restrict his privileges or from reporting the adverse actions to the NPDB.  [Id. at ¶ 43.]

Plaintiff argues that Defendant's actions and omissions violate Plaintiff's Fifth Amendment rights to substantive and procedural due process of law and that, as a direct result, he has suffered and will suffer irreparable harm to his professional reputation, standing, and earning capacity.  Plaintiff seeks: a declaratory judgment that the adverse actions against him were invalid; preliminary and permanent injunctions against the continued suspension or restriction of his privileges and against the making of any report concerning Plaintiff to the NPDB; attorneys' fees and costs; and any other appropriate relief.

In the instant Motion, Plaintiff states that, on March 29, 2010, he received a Notice of Proposed Adverse Clinical Privileging Action by the Commander dated March 22, 2010 from Defendant purporting to further restrict Plaintiff's privileges

("March 22, 2010 Notice").[1]  The March 22, 2010 Notice states
that the Credentials Committee met on February 12, 2010 to
discuss the CQMQA investigation and the peer review panel, and it
discussed updated information on March 12, 2010.  The March 22,
2010 Notice listed several alleged clinical deficiencies, but did
not include any specific dates or patient records.  The March 22,
2010 Notice stated that Plaintiff had the right to request a
hearing on this decision within thirty days and that the failure
to do so would constitute a waiver of his right to a hearing and
an appeal.  The March 22, 2010 Notice also required Plaintiff to
immediately return to the neurology clinic, which Plaintiff
contends is a hostile and unsafe working environment for him.

        The Motion seeks a temporary restraining order:
"confirming the ineffectuality of Defendant Jones' Notice dated
March 22, 2010, restoring his clinical privileges, . . .
preventing Defendants from making any adverse reports about
Plaintiff to the National Practitioners Data Bank"; [Mem. in Sup.
of Motion at 19;] and restraining Defendant from "conducting any
administrative hearing concerning Plaintiff's medical
privileges".  [Motion at 2.]  Plaintiff argues that he is likely
to succeed on the merits of his due process claim and that he is
likely to suffer irreparable harm if this Court does not issue

---

[1] The March 22, 2010 Notice is attached to the Motion as
Exhibit J to the Declaration of Michael B. Russo, M.D., and to
the Memorandum in Opposition as Exhibit 5.

the restraining order.  If Defendant reports the suspension and/or abeyance of Plaintiff's privileges to the NPDB, it will cause irreparable harm to Plaintiff's professional standing and reputation.  It could also affect Plaintiff's privileges elsewhere, his licensing status, his ability to obtain liability insurance, and his future employment opportunities.  Even if Plaintiff ultimately prevails, any negative report to the NPDB cannot be removed; it can only be clarified, and there is no assurance that anyone accessing the negative report will see the clarifying entry.

Plaintiff argues that a temporary restraining order is in the public interest because the allegations against him are unfounded and Defendant is preventing him from providing high quality services to his patients and the public.  Plaintiff also contends that the public interest favors the issuance of the temporary restraining order because Defendant retaliated against him for making meritorious suggestions to improve the quality and efficiency of patient care at TAMC.  Finally, Plaintiff argues that the balance of equities is in his favor because he will suffer irreparable harm without the restraining order, but Defendant will not suffer any real harm if the Court grants the restraining order.

In his memorandum in opposition, Defendant argues that the Court should deny the Motion because Plaintiff: has not

exhausted his intra-service administrative remedies; has not demonstrated that he will suffer irreparable harm without a temporary restraining order; and has otherwise failed to make the extraordinary showing required to obtain a temporary restraining order.  According to Defendant, within months of Plaintiff's arrival at TAMC, other neurologists expressed concerns that Plaintiff was not following clinical protocols and procedures, was not properly documenting patient care, was not answering phone consults, and generally was not as productive as his position required.  In August 2008, in response to concerns raised by another neurologist, Dr. Weber, the Chief of the Neurology Clinic, randomly reviewed ten of Plaintiff's patient charts and was concerned about Plaintiff's lack of documentation. Dr. Weber then conducted a clinic peer review of approximately thirty randomly selected charts, and all of the peer reviewers concluded that the charts showed inadequate documentation.  They also raised concerns about poly-pharmacy, excessive, and inappropriate ordering of sleep studies, and failure to focus on patients' primary neurological problems.  Plaintiff was counseled about following clinic procedures and completing proper documentation, and his charts were subjected to further monitoring.  Defendant states that Plaintiff's problems

persisted.  [Mem. for Credentials Committee (Feb. 26, 2009)[2] at 3-4.]

In November 2008, Commander Dickert, the Chief of Neurology, recommended that the Credentials Committee review Plaintiff's documentation practices.  He also conducted further counseling with Plaintiff.  Commander Dickert learned of continued problems at the end of December 2008, prompting him to recommend on January 9, 2009 that Plaintiff be administratively removed from patient care and subjected to a formal competency review.  [Id. at 4.]  Defendant points out that the January 16, 2009 memorandum informing Plaintiff of his summary suspension expressly states that summary suspension is not reportable by the Department of Defense ("DoD").  [Notice of Summary Suspension of Clinical Privileges/Practice (Jan. 16, 2009)[3] at 1.]  On January 26, 2009, Defendant notified Plaintiff in writing that he had a right to submit a written statement about the concerns raised against him.  Plaintiff submitted a statement on January 30, 2009.  [Mem. for Credentials Committee (Feb. 26, 2009) at 5.]  Defendant acknowledges that Dr. Francis, the CQMQA

---

[2] The Memorandum for Credentials Committee is attached to the Motion as Exhibit F to the Russo Declaration and to the Memorandum in Opposition as Exhibit 1.

[3] The Notice of Summary Suspension of Clinical Privileges/Practice is attached to the Motion as Exhibit E to the Russo Declaration and to the Memorandum in Opposition as Exhibit 2.

investigating officer, concluded that there were no reasons to revoke all of Plaintiff's privileges, but Defendant notes that Dr. Francis also identified a clear pattern of deficiencies which warranted either restriction of Plaintiff's privileges or transfer to a less demanding area.  [Id. at 13.]  Defendant points out that the peer review panel reviewed extensive documentation, conducted several interviews, including Plaintiff's, and examined Plaintiff's formal response with exhibits.  [Mem. for COL Joseph Dai, Chair, Credentials Committee, TAMC (May 4, 2009).[4]]  Although Plaintiff's privileges were conditionally reinstated on June 5, 2009, he was subject to a plan of supervision that had to be modified on October 8, 2009. The modified plan provided that supervision over Plaintiff would gradually reduce as he displayed satisfactory performance.  [Mem. for Record (Oct. 8, 2009) at 1.[5]]  Apparently, Defendant's position is that Plaintiff never attained satisfactory performance, and the supervision plan continued beyond the anticipated October 30, 2009 end date.  After further review on February 12 an March 12, 2010, the Credentials Committee

---

[4] The Memorandum for COL Joseph Dai, Chair, Credentials Committee, TAMC is attached to the Motion as Exhibit G to the Russo Declaration and to the Memorandum in Opposition as Exhibit 3.

[5] The Memorandum for Record is attached to the Motion as Exhibit I to the Russo Declaration and to the Memorandum in Opposition as Exhibit 4.

recommended to Defendant that Plaintiff's privileges be restricted to supervised.  [March 22, 2010 Notice at 1.] Defendant therefore issued the March 22, 2010 Notice, which provides that Plaintiff has thirty duty days, *i.e.* until May 3, 2010, to request a hearing.  [Id. at 1-2.]

Defendant argues that Plaintiff is not likely to prevail on the merits because there was cause for his summary suspension.  Numerous colleagues noted Plaintiff's problems, and Plaintiff had the opportunity to improve through counseling and chart review.  Defendant argues that a single "critical incident" is not required for summary suspension; Plaintiff's pattern of inappropriate care was sufficient.

Defendant also argues that, under the process established by Army Regulations, Plaintiff was not entitled to a formal hearing during his summary suspension.  Summary suspension is the first step, followed by the CQMQA investigation - the second step, and the Credential Committee's initial review - the third step.  Based on the CQMQA investigation report and the Credential Committee's report, the Commander may elect to proceed to the fourth step, formal peer review.  The peer review panel considers all evidence and makes a recommendation to the Credentials Committee - step five.  In the sixth step, the Credentials Committee reviews the peer review panel's recommendations and, if necessary, updates its recommendations.

In the seventh step, the Commander reviews all the evidence and recommendations and decides whether to pursue an adverse privileging action.   If the Commander decides to propose that the Surgeon General deny, suspend, restrict, reduce, or revoke the provider's privileges, the Commander must notify the provider in writing.   The notice must also inform the provider of his right to request a formal hearing and the right to request reconsideration or appeal.   [Army Reg. 40-68,[6] ¶ 10-6.]   Thus, Defendant argues that Plaintiff was not entitled to request a formal hearing until he received the March 22, 2010 Notice from Defendant.   Defendant also argues that the March 22, 2010 Notice does not impose additional restrictions on Plaintiff's privileges, which were already summarily suspended.   Further, Defendant argues that the recent findings of the Credentials Committee warranted the issuance of the March 22, 2010 Notice.

        Defendant states that there are several other layers of due process available to Plaintiff before his adverse privileging action can be reported to the NPDB.   Plaintiff can request a full hearing and the board chairperson will provide him with notice of: the time, date and place of the hearing; the names of witnesses; his right to be present and submit evidence; his right to question witnesses and call witnesses; and his right to

---

        [6] Army Regulation 40-68 is attached to the Motion as Exhibit A to the Declaration of Eric A. Seitz, and to the Memorandum in Opposition as Exhibit 12.

consult with counsel and have counsel present at the hearing. [Army Reg. 40-68, ¶ 10-8(b).]  If the Commander considers the hearings board's recommendations and decides to continue with the adverse action, Plaintiff can formally request reconsideration by the Commander.  If the Commander denies a request for reconsideration, the request is endorsed to the Surgeon General as an appeal.  The Medical Command ("MEDCOM") Quality Management Division ("QMD") will then convene an appeals board, which will make findings and recommendations to the Surgeon General.  The Surgeon General reviews all documents and evidence and makes the final decision on the privileging action.  [Id., ¶ 10-10.]  Only the Surgeon General may report a provider to the NPDB and no adverse privileging action will be reported until the provider's appeal, if he requested one, is complete.  [Id., ¶ 14-3.b.(1)(a).]

Defendant argues that Plaintiff's due process claim based on possible reporting to the NPDB is not likely to succeed on the merits because the DoD's and the Army's procedures adequately protect Plaintiff's due process rights before any report to the NPDB.  Further, insofar as the Surgeon General has not made a final decision on Plaintiff's adverse privileging action, Plaintiff cannot establish that he is likely to suffer imminent, irreparable harm if the Court does not issue a temporary restraining order.  Plaintiff's reliance on cases

13

involving the automatic reporting of civilian providers after thirty days is misplaced because the DoD's reporting rules allow providers additional protections before a report to the NPDB. Within the DoD, the thirty-day period to make a report to the NPDB does not run from the summary suspension; the period begins when the Surgeon General makes his final decision.[7] [DoD 6025.13-R, Military Health System (MHS) Clinical Quality Assurance (CQA) Program Regulation, C10.6.1., Exh. 11 to Mem. in Opp. at 18 ("The Surgeon General shall report to NPDB . . . all final adverse privileging actions consistent with the NPDB reporting. Reporting shall occur within 30 calendar days of the date of Surgeon General [sic] approve the adverse privileging action.").] Defendant argues that the Court should deny the Motion because Plaintiff cannot establish an imminent threat of irreparable harm.

---

[7] DoD 6025.13-R, Military Health System (MHS) Clinical Quality Assurance (CQA) Program Regulation, DL1.1.51. states, in pertinent part:

> The temporary removal of all or part of a provider's privileges, taken prior to the completion of due process procedures . . . is needed to protect patients or the integrity of the command resulting from cases involving the temporary removal from cases, professional or behavioral impairment or negligence. A summary suspension could continue until due process procedures are completed. Summary suspension of privileges within the Department of Defense is not reportable to the NPDB, unless the final action is reportable.

[Exh. 11 to Mem. in Opp. at 11.]

Defendant contends that the balance of the equities tips in the defense's favor.  Plaintiff is not facing imminent, irreparable harm, and Defendant will face undue hardship if the Court intervenes in the Army's internal regulatory process. Defendant also argues that a restraining order is not in the public interest because of the widespread concerns about the care that Plaintiff provided at TAMC and because there is no evidence supporting Plaintiff's claims that the complaints against him were retaliatory.  Defendant argues that the public interest favors denial of the Motion because the Army has a strong interest in protecting TAMC patients and because there should be minimal judicial interference in the Army's internal affairs.

In his reply, Plaintiff reiterates many of the arguments raised in the Motion.  In addition, he argues that his claims are ripe because he should have had adequate notice and a hearing before his privileges were summarily suspended on or about January 8, 2009.  At the very least, he should have been afforded a hearing to contest Defendant's June 5, 2009 restriction of his privileges.  Plaintiff argues that Defendant's March 22, 2010 Notice, which offered the opportunity for a hearing, was untimely.

Further, Plaintiff argues that 42 U.S.C. § 11133 requires health care entities to report adverse privileging actions which last longer than thirty days, and there is no

15

statute exempting the DoD from this requirement.  The DoD's Memorandum of Understanding also requires the DoD to report adverse privileging actions based on incompetent or negligent performance.  Plaintiff argues that Surgeon General could immediately report him to the NPDB because his privileges have been suspended and/or restricted since January 2009.  Plaintiff acknowledges that Army Regulations prohibit an NPDB report while an appeal is pending, but he argues that the Surgeon General could interpret his failure to appeal the June 5, 2009 adverse privileging action as a waiver of his right to appeal.  Even though Defendant has represented that Plaintiff is not currently reportable to the NPDB, Plaintiff argues that the Army has failed to follow Army Regulation 40-68 up to this point, and there is no guarantee that the Army will follow it now or that the Surgeon General will abide by Defendant's interpretation of Army Regulation 40-68.

## STANDARD

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  G. v. State of Haw., Dep't of Human Servs., 2009 WL 2877597 (D. Haw. Sept. 4, 2009); Schoenlein v. Halawa Corr. Facility, 2008 WL 2437744 (D. Haw. June 13, 2008).

The Supreme Court has cautioned that a "preliminary injunction is an extraordinary and drastic remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 376 (2008) (citing Munaf v. Geren, 128 S.Ct. 2207, 2219 (2008)).  Courts balance the competing claims of injury and consider the effect on each party of

16

granting or denying the injunction.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  <u>Winter</u>, 129 S.Ct. at 374; <u>accord</u> <u>Sierra Forest Legacy v. Rey</u>, 577 F.3d 1015, 1021 (9th Cir.2009) ("Under <u>Winter</u>, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.").  Even if a movant demonstrates a likelihood of success on the merits, the requested injunction will not issue when there is only a possibility of irreparable harm or when there is no possibility of irreparable harm. <u>Winter</u>, 129 S.Ct. at 374-76; <u>Sierra Forest Legacy</u>, 577 F.3d at 1022.

<u>Moore v. Nat'l City Mortgage Co.</u>, Civil No. 09-00461 SOM-KSC, 2010 WL 234866, at *1 (D. Hawai'i Jan. 21, 2010).

In order to warrant a temporary restraining order, the threat of harm must be "actual and imminent, not conjectural or hypothetical[.]"  <u>See</u> <u>Summers v. Earth Island Inst.</u>, 129 S. Ct. 1142, 1149 (2009) (requirements for injunctive relief); <u>see also</u> <u>Kokka & Backus, PC v. Bloch</u>, No. C 10-0110 RS, 2010 WL 331336, at *3 (N.D. Cal. Jan. 20, 2010) (even if the plaintiff could establish its likelihood of success on the pending motion for preliminary injunction, it was not entitled to a temporary restraining order because it failed to show a threat of imminent harm); <u>Bejaran v. Cal. Dep't of Corr. Rehab.</u>, No. CIV. S-08-00817 DAE, 2010 WL 234845, at *2 (E.D. Cal. Jan. 14, 2010) ("Upon a

17

motion for a temporary restraining order or preliminary injunction, a plaintiff must show that he is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical . . . ." (quoting <u>Summers</u>, 129 S.Ct. at 1149) (quotation marks omitted)).

## DISCUSSION

In the Court's view, the critical issue in the instant Motion is whether Plaintiff faces an actual and imminent threat of irreparable harm.  <u>See G. v. Hawaii, Dep't of Human Servs.</u>, Civ. Nos. 08-00551 ACK-BMK, 09-00044 ACK-BMK, 2009 WL 2877597, at *5 (D. Hawai'i Sept. 4, 2009) ("Because Plaintiffs have failed to establish a likelihood of irreparable harm, which is an essential element for preliminary injunctive relief, the Court need not consider their likelihood of success on the merits, the balance of equities, or the public interest." (citing <u>Am. Trucking Ass'ns v. City of Los Angeles</u>, 559 F.3d 1046, 1052 (9th Cir. 2009); <u>Germon v. Times Mirror Co.</u>, 520 F.2d 786, 788 (9th Cir. 1975))).

Plaintiff asks the Court to: rule that the March 22, 2010 Notice is ineffectual; restore his clinical privileges; prevent Defendant from conducting any administrative hearings regarding Plaintiff's privileges; and prevent Defendant from making any adverse reports about Plaintiff to the NPDB.  First, the Court finds that the March 22, 2010 Notice, in and of itself,

18

does not pose an actual and imminent threat of irreparable harm. The March 22, 2010 Notice states that Defendant had decided to restrict Plaintiff's clinical privileges for an indefinite period for "numerous clinical deficiencies." [March 22, 2010 Notice at 1.]  This was step seven in the Army's multi-step process for invoking an adverse privileging action.  [Army Reg. 40-68, ¶ 10-6f.(7).]  Plaintiff has the right to request a hearing, [Id., ¶ 10-8 (Hearing board procedure),] and he may request reconsideration of the decision that Defendant makes after reviewing the hearings board's recommendation.  [Id., ¶ 10-9 (Action on hearing recommendations), 10-10 (The appeals process).]  If Defendant denies reconsideration, Plaintiff's request will be automatically endorsed as an appeal to the Surgeon General.  [Id., ¶ 10-10b.]  An appeals board will consider the appeal, along with all other pertinent information, and make its own findings and recommendations to the Surgeon General.  The Surgeon General then makes the final decision on the privileging action.  [Id., ¶ 10-10f.]  Thus, insofar as the March 22, 2010 Notice is only one step in a multi-step adverse privileging process that has been on-going since January 2009, and insofar as there are a number of steps available in the process before a final decision, the March 22, 2010 Notice does

not present an actual and imminent threat of irreparable harm.[8]

Similarly, Plaintiff's clinical privileges have been under some form of restriction since January 2009.  Thus, a temporary restraining order restoring Plaintiff's clinical privileges would not preserve the status quo.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local 70 of Alameda County, 415 U.S. 423, 439 (1974) (noting that a temporary restraining order is restricted to its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer").  Except for the threat of a report to the NPDB, which is discussed infra, there is no threat of actual and imminent irreparable harm which would require this Court to issue a temporary restraining order restoring Plaintiff's clinical privileges.

This Court also finds that there is no actual and imminent threat of irreparable harm that would require a temporary restraining order preventing any administrative hearing regarding Plaintiff's clinical privileges.  First, there is no

---

[8] The Court notes that Plaintiff argues that the March 22, 2010 Notice requires him "to immediately return to the neurology clinic where the unfounded allegations of clinical incompetence arose, in spite of Plaintiff's concerns that the neurology clinic is a hostile and unsafe working environment."  [Mem. in Supp. of Motion at 9 (citation omitted).]  The Complaint alleges that Plaintiff has suffered various forms of retaliation in the neurology clinic because of his suggestions to improve the clinic.  Plaintiff has not presented sufficient evidence to establish that he faces an actual and imminent threat of irreparable harm if required to return to the neurology clinic.

indication that the Army or the DoD will conduct a formal hearing without Plaintiff's consent; he must a request a hearing.  [Army Reg. 40-68, ¶ 10-7b.]  This Court is aware that Plaintiff contends that the Army's hearing procedures do not adequately protect his due process rights.  Even assuming, *arguendo*, that Plaintiff is likely to succeed on his due process claim, there is no indication that merely conducting the hearing, assuming that Plaintiff requests one,[9] will cause irreparable harm to Plaintiff.

The crux of the instant Motion is whether Plaintiff is facing an actual and imminent threat of irreparable harm from a report to the NPDB.  At the hearing on the Motion, Defendant acknowledged that a report to the NPDB could be detrimental to a provider's career.  This Court finds that an adverse privileging report to the NPDB would cause irreparable harm to Plaintiff. This Court will therefore focus on the issue whether the threat of a report to the NPDB is actual and imminent.

A. **Background of the DoD's Participation in the NPDB**

Under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § § 11101-11152, medical entities are required to submit to the National Practitioner Data Bank ("NPDB") certain information concerning the professional competence and conduct of health care practitioners in their employ.  The HCQIA established the NPDB and placed

---

[9] At the hearing on the Motion, Plaintiff's counsel indicated that Plaintiff would request a hearing if this Court denied the Motion.

> it under the control of the Department of Health
> and Human Services ("DHHS").  The NPDB is
> essentially an online-database created by the DHHS
> to share information on doctors who have adverse
> employment actions taken against them.  Congress
> established the NPDB "to restrict the ability of
> incompetent physicians to move from State to State
> without disclosure or discovery of the physician's
> previous damaging or incompetent performance."  42
> U.S.C. § 11101(2).

Zheng v. Quest Diagnostics, Inc., 248 Fed. Appx. 416, 417 (3d

Cir. 2007).

> The HCQIA requires that:
>
> Each health care entity which--
>     (A) takes a professional review action that
>     adversely affects the clinical privileges of
>     a physician for a period longer than 30 days;
>     . . . .
> shall report to the Board of Medical Examiners, in
> accordance with section 11134(a) of this title,
> the information described in paragraph (3).

42 U.S.C. § 11133(a)(1).  Defendant argues that this reporting

requirement does not apply to the DoD and that the DoD has

additional due process protections for providers before they are

reportable to the NPDB.  Plaintiff acknowledges that the HCQIA

directs the Secretary of Health and Human Services to enter into

a memorandum of understanding with the Secretary of Defense, see

42 U.S.C. § 11152(b), but Plaintiff argues that there is no

statute which exempts the DoD from the requirements of the HCQIA.

> The regulations establishing the reporting requirements

to the NPDB are

> applicable to hospitals; health care entities;
> Boards of Medical Examiners; State licensing

authorities; professional societies of physicians,
dentists or other health care practitioners which
take adverse licensure of professional review
actions; State licensing or certification
authorities, peer review organizations, and
private accreditation entities that take negative
actions or findings against health care
practitioners, physicians, dentists, or entities;
and entities (including insurance companies)
making payments as a result of medical malpractice
actions or claims. . . .

45 C.F.R. § 60.2.  Having reviewed the applicable statutes and
regulations and the definitions of the relevant terms, this Court
finds that the statutes and regulations do not apply to the DoD.
The DoD participates in the NPDB program pursuant to the
September 21, 1987 Memorandum of Understanding Between the
Department of Health and Human Services and the Department of
Defense ("Memorandum of Understanding").  [Exh. 6 to Mem. in
Opp.]

The Memorandum of Understanding states that: "The DoD
shall report all instances in which a DoD health care
practitioner's clinical privileges are denied, limited
(restricted), or revoked by an Agency of the DoD for reason of
incompetent or negligent performance."  [Id. at 2.]  On
November 1, 1990, the DoD issued a Directive which, *inter alia*,
implemented the HCQIA and the Memorandum of Understanding and
established DoD policies and procedures for the DoD's
participation in the NPDB program.  [Exh. 9 to Mem. in Opp. at
1.]  It charges the Military Departments with developing policies

23

and procedures to comply with the Directive and subsequent instructions.  The policies and procedures must ensure that the Office of the Surgeon General sends appropriate information to the NPDB.  [Id. at 3.]

On June 11, 2004, the Assistant Secretary of Defense for Health Affairs issued the Military Health System (MHS) Clinical Quality Assurance (CQA) Program Regulation ("DoD 6025.13-R"), which applies to the Military Departments.  [Exh. 11 to Mem. in Opp. at 2.]  Chapter 10 of DoD 6025.13-R establishes requirements and procedures for the DoD's participation in the NPDB program.  [Id. at 13.]  Army Regulation 40-68, effective March 26, 2004 and revised May 22, 2009, implements DoD 6025.13-R and other DoD guidance.  [Army Reg. 40-68 at 5.]  Chapter 10 of Army Regulation 40-68 governs adverse privileging actions and Chapter 14 addresses various issues regarding provider information, including the Surgeon General's responsibilities in reportable actions to the NPDB.  [Id. at 6, 28.]  These documents govern any Army or DoD reports to the NPDB.

**B.    Imminency of NPDB Report in This Case**

The March 22, 2010 Notice is not a final decision that is reportable to the NPDB.  [Army Reg. 40-68, ¶ 10-10f. ("The findings and recommendation of the appeals board are advisory in

24

nature and do not bind the appellate authority.[10]  TSG is the sole authority responsible for provider notification of the final decision associated with an appeal.  To remove any potential conflict, no other parties will have input into the final decision by the appellate authority."), ¶ 14-3 ("The Surgeon General is the sole reporting authority to the NPDB.").]  If Plaintiff requests a hearing, as stated in the March 22, 2010 Notice, there are several procedural steps that are available to him before the Surgeon General makes a final decision that would be reportable to the NPDB.  The Court notes that the failure to request a hearing constitutes a waiver of the provider's hearing and appeal rights and will lead to a NPDB report.  [Id., ¶ 10-7b.(4).]  At the hearing on the Motion, however, Plaintiff's counsel represented that, if this Court denies the Motion, Plaintiff will request a hearing (albeit with objections about the adequacy and propriety of the hearing and the entire process).  This Court therefore FINDS that there is no imminent threat that the March 22, 2010 Notice will trigger a report to the NPDB.

Plaintiff also argues that the Surgeon General could report him at any time because he failed to appeal Defendant's June 5, 2009 adverse privileging action.  Defendant apparently

---

[10] The Surgeon General ("TSG") is the appellate authority. [Army Reg. 40-68, ¶ 10-10f.]

issued a June 5, 2009 memorandum to Plaintiff which provided a

Notice of Decision ("June 5, 2009 Notice").  [Mem. for Record

(Oct. 8, 2009) at 1.]  First, the Court notes that neither party

included the June 5, 2009 Notice in the moving papers.  The Court

pointed that fact out to counsel during the hearing on the

Motion, but neither party has provided the June 5, 2009 Notice.

The October 8, 2009 Memorandum for Record written by Captain Lane

provides the following information about the June 5, 2009 Notice:

> 1.   In a memorandum dated 5 June 2009, BG Jones
> provided COL Russo with a Notice of Decision which
> **conditionally reinstated** Dr. Russo's clinical
> privileges at TAMC and Schofield Barracks Health
> Clinic, HI.  The decision included a 60 day
> requirement for "ongoing monitoring and evaluation
> and to allow time for systems based training".
>
> 2.   In a memorandum also dated 5 June 2009, I
> prepared a POS based on specific recommendations
> made by the Peer Panel following their review of
> COL Russo's clinical performance.  The POS
> included a requirement for retraining in AHLTA,
> MAPS training, personal assistance in developing
> encounter macros and retaining in the proper
> coding of encounters.  The POS also called for a
> 30 day chart review by local Neurology Service
> clinicians and an electronic review of Dr. Russo's
> clinical documentation by the previously named
> Peer Panel.

[Id. (emphasis added).]  The October 8, 2009 Memorandum for

Record clarified and made modifications to Plaintiff's June 5,

2009 POS.  It set forth four phases for continued review of

Plaintiff's work and documentation.  When Plaintiff

satisfactorily completed each phase, his supervision would be

reduced.  [Id.]  Captain Lane also stated: "The POS is expected

to be completed not later than 30 October 2009.  Upon completion
of the POS, I will forward a summary of the results to the
Credentials Committee for a review and analysis." [Id. at 2.]
Plaintiff stated in the Complaint that the June 5, 2009 Notice
did not discuss his right to request a formal hearing.
[Complaint at ¶ 33.]

       Based on the information in the record about the June
5, 2009 Notice, this Court finds that it does not constitute an
action by the commander under Army Regulation 10-6f.(7).  It was
merely part of the continuing monitoring of Plaintiff's progress
in the areas for which he was under review.  The June 5, 2009,
was a **conditional** reinstatement, not a definitive ruling.  It was
accompanied by a POS which, as later amended, clearly
contemplated further review and monitoring with decreased
supervision if Plaintiff displayed satisfactory performance.  In
addition, Defendant has not contested Plaintiff's representation
that the June 5, 2009 Notice did not inform Plaintiff of his
right to a hearing.  A Regulation 10-6f.(7) notice must inform
the provider of his hearing and appeal rights.  [Army Reg., ¶ 10-
6f.(7)(c).]  The failure to include that information in the
June 5, 2009 Notice supports the conclusion that the June 5, 2009
Notice was not Regulation 10-6f.(7) notice.  Insofar as the
June 5, 2009 Notice did not include a right to hearing, Plaintiff
cannot be said to have waived any hearing or appeal right by

failing to appeal the June 5, 2009 Notice.  [Id., ¶ 10-7b.(5).]
This Court therefore FINDS that there is no imminent threat that
the June 5, 2010 Notice will trigger a report to the NPDB.

Although Plaintiff has established that a report of an
adverse privileging action against him to the NPDB would cause
irreparable harm, Plaintiff has not established that the threat
is imminent.  Insofar as an actual and imminent threat of
irreparable harm is a required element to obtain a temporary
restraining order, this Court need not address Plaintiff's
likelihood of success on the merits, the balance of the equities,
or the public interest.  See G. v. Hawaii, Dep't of Human Servs.,
2009 WL 2877597, at *5.

### CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for
Temporary Restraining Order, filed April 5, 2010, is HEREBY
DENIED.

IT IS SO ORDERED.

28

DATED AT HONOLULU, HAWAII, April 20, 2010.



 /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge

**MICHAEL R. RUSSO, M.D. V. STEPHEN L. JONES, ETC; CIVIL 10-00125 LEK; ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**